On Rehearing.
Statement of the Case.
MONROE, J.
A rehearing was granted in this case because of its importance, not only to the present litigants, but possibly to-others who may be now or hereafter similarly situated; and, whilst the court has not changed its views as to the main issue or as to the decree to be rendered, advantage will be taken of the, opportunity to restate its position in one or more particulars.
Plaintiff alleges that it has been in possession for more than a year of a tract constituting the southern two-thirds of a section of land in the parish of Acadia (S. 47, T. 9 S., R. 2 W.), known as the “Corkran Grant,” and it complains of disturbance by the defendant, consisting of the erection thereon of a derrick, and prays for judgment “quieting its possession * * * and restoring petitioner to the possession held by it before said disturbance,” and to that end *72 for a writ of injunction, which issued ex parte, restraining defendant from interfering with plaintiff’s possession of the land, and ordering the removal of the derrick referred to in the petition.
The defendant denies the allegations of the petition save such as may he specially admitted. It admits that when the injunction was sued out it was in possession of the west 40 acres of that part of the land described in the petition known as the “Latreille Tract,” but “avers that it was then lawfully in possession of the said land for the following reasons, to wit:”
That on April 19, 1901, by an act under private signature, recorded April 20, 1901, Arthur Latreille leased said 40-acre tract to S. A. Spencer, his successors and assigns, for 10 years, and so long thereafter as oil or gas shall be produced. That said lease was transferred to S. A. Spencer & Co. and by S. A. Spencer & Co. to defendant by acts under private signature dated April 24, 1901, and February 8, 1902, respectively, and recorded April 26, 1901, and February 10, L902, respectively, all of which acts are annexed to and made part of the answer.
That the commencement of respondent’s operations under said lease having been delayed beyond the time fixed therefor, respondent and its authors, on or before October 19, 1901, January 19, 1902, and April 19, 1902, respectively, paid to said Latreille the sum of $50 ($150 in all) as the rental to be paid, quarterly, in advance, for each additional three months said operations might be delayed; and that on or about July 19, 1902, it tendered him a like sum, which he declined to accept, on the ground that he preferred to ayait the determination of the suit of the Corkran Oil & Development Company v. Arnaudet et al., then pending, wherein his title to the land in question was put at issue, and that like tenders have since been made with like results.
“Respondent also avers that, even if it were otherwise bound, under the terras of the said contract, to commence operations at any fixed or determinate time, which is denied, it was legally excused from so doing- by the. acts of the said Latreille hereinabove recited; that the said Latreille not only acquiesced in the said delay, but invited the same; and that he not only did not at any time declare the forfeiture of said contract, but never even put your respondent in default with reference to the same. And your respondent also shows that, even if it were otherwise bound under the said contract to commence operations at any particular time, which is again denied, it was legally excused from so doing, because on December 6, 1901, the Corkran Oil & Development Company instituted in this honorable court its suit, No. 1,405, to which the said Latreille was a party, and by which the oil company proved [demanded?] to be recognized as the owner of the tract of 40 acres hereinbefore described; that said suit was decided by this court against the plaintiff therein on July 28, 1902, but that said plaintiff promptly appealed from said judgment; that on November 3, 1903, said judgment was affirmed on appeal, but that the same did not become final until the denial of plaintiff’s application for rehearing on the 18th day of January, 1904. Respondent further avers that promptly after the decision of said cause on appeal it commenced operations on said land by erecting a derrick and placing machinery thereon, with the bona fide intention of immediately mining and operating for oil and gas, and that it was actually engaged in boring a well for that purpose, when it was prohibited from further prosecuting the said work by the service of the writ of injunction herein.”
Respondent alleges that said writ issued without legal justification, has inflicted great injury, and should be set aside,’and it prays “that the demands of the plaintiff herein be rejected and dismissed, that the said writ .of injunction be annulled and set aside, and that your petitioner be decreed lawfully entitled to the possession of the said tract of land for the purposes stated in the aforesaid contract of April 19, 1901, hereto annexed.” There is also a prayer in recon-' vention for damages.
Upon the trial of .the case the execution and registry of the contract thus referred to by defendant, as also the transfers by which the defendant became “the party of the second part” therein, were established, and it was further shown that upon October 12, *73 1801, the defendant paid to the plaintiff the sum of $50, and took its receipt as follows:
“$50. Received, Jennings, La., October 12, 1901, of S. A. Spencer, acting for himself and his assigns of the contract hereinafter mentioned, fifty dollars, being the first quarterly payment, in advance, for delay in operations, as stipulated in the contract of April 19th, 1901, between Arthur Latreille and S. A. Spencer, his successors and assigns, recorded in the parish of Acadia on April 20, 1901, in Conveyance Book X, page 48. [Signed] Arthur Latreille.”
It was further shown that before the expiration of the delay to which the payment thus made relates the Corkran Oil & Development Company brought suit against Latreille and other parties interested, including S. A. Spencer & Co., his lessees, for the recovery of the entire Corkran grant, of which the 40 acres here in question forms part (which suit, it may here be remarked, was decided by this court on appeal in favor of the defendant, in November, 1908, the judgment becoming final January, 1904). Upon January 16 and April 15, 1902, respectively, payments of $50 were made by defendant to the lessor as upon October 12, 1901, and receipts similar to the one of that date were taken. A few days before the beginning of the next quarter, a conflagration, originating in a flash of lightning, broke out upon the oil field in which defendant was interested, and was still raging upon the day (say July 19th) when the further payment of $50 should have been made, and it so occupied the attention of the defendant’s president and manager that he omitted to make the payment on or before that day, and did not tender the money until a few days later, say, on July 23d, when it was refused; and thereafter, at the beginning of each quarter, the amount called for by the contract was tendered by respondent, refused by the lessor, and deposited in bank to the credit of the latter’s account.
In May, 1903, the Corkran grant, including the 40 acres here in question, was transferred by Latreille and his co-owners to the plaintiff (a corporation composed of Latreille and his said co-owners) in payment of their subscription to its capital stock, and the plaintiff, as the successor in title of Latreille, also refused the tenders made by defendant under its contract. In fact, as we understand the record, it was by the advice of his present associates that Latreille took the position which he now occupies, though he seems also to have been influenced by the threatening of the suit, brought by the Cork-ran Oil Company. Upon this subject the defendant’s president testifies as follows:
“Q. Mr. Heywood, did Mr. Latreille ever tell you any reason why he did not desire the • * * syndicate to drill upon this property? A. Well, every time I tendered him the money, I asked him to accept the money, and to allow us to go on and operate, and he said, not once, but several times, to wait until after the decision of the Supreme Court in the Corkran suit, and to wait. (Objection and ruling by the court.) * * * Well, until the Supreme Court decided the case. And I told Mr. Latreille further that, if he would accept the money and the one-eighth royalty, I was positive that we would get good people to go there and drill. * * * And I would say further that I have made repeated offers to good people to develop the land, and they have declined to do so, and that my last attempt was with the Rayne Planters Oil & Development Company. I had those gentlemen ready to go and drill, and had accepted a written proposition for the syndicate, and had gone so far as to deliver the contract for them to go and drill, when they began urging me to make some kind of a compromise with the Houssiere Latreille Oil Company, and, as they told me,” etc.
(The statement of what he was told, being objected to, but the fact being otherwise proved that the Rayne Company entered into a contract with the plaintiff for the development of oil on the land in question.) Latreille’s testimony on the same subject reads as follows:
“Q. Mr. Latreille, state whether or not you said to Mr. Heywood at any time that you were willing to wait until the Corkran suit was decided before receiving any rent from your property, or before requiring any oil operations to be attempted thereon? A. No, sir. Q. Did you tell that to Mr. Heywood at any time? A. Perhaps I told him that I would decide, but pending the decision I would do nothing. Perhaps after the decision I would consider it, but I did not say so.”
*74 On December 3, 1903, the plaintiff entered into a contract with the Rayne Company (referred, to in the testimony of Heywood) whereby the latter undertook to bore for oil on the land in controversy, and a fortnight later the defendant erected a derrick on said land, and had a 12-inch pipe sunk to a depth of 200 feet when the work was stopped by the injunction herein issued. In the meanwhile and some 15 days or 3 weeks after defendant had begun to bore, the Rayne Company, under its contract with the plaintiff, also began a well, which, as we understand, though it does not appear in the record before us, was completed, and has since produced a vast quantity of oil. The witness Latreille further testifies that he objected to defendant’s beginning work when it did, but he does not say that in so doing he represented the plaintiff. Latreille also testifies that he conveyed to the plaintiff only the mineral rights in the land, and, as no objection was made to that testimony by plaintiff’s counsel, who offered him as a witness, and no attempt to qualify or explain it, we take it to be true, although the instrument of transfer offered in behalf of plaintiff fails to show any reservation. He likewise testifies at one time that after the transfer he held possession of the property for the plaintiff, but a later cross-examination proceeds as follows:
“Q. Did you not state in your cross-examination that you stayed on that land without any understanding whatever with the Houssiere-Latreille Oil Company? What- is your answer? A. I remained there, being proprietor. Q. Proprietor of what? A. I did not sell anything but the mineral rights to the company. They did not have anything but the mineral rights, and I remained proprietor of the other rights. Q. Then, as I understand it, that was the only reason why you stayed on this property, and that there was no need of any authorization from anybody for you to stay there? A. Yes, sir; as being one of the stockholders, I had a right to stay there, being one of the largest stockholders, I could remain there; and I had surface rights also. Q. Then, as I understand it, the only reason why you remained there was that you were a large stockholder of the company, and the owner of the surface rights; consequently you did not need the permission or the request of. anybody to stay there? A. No, sir. Q. There was none given? A. There was none given, I don’t think. Q. Is it not a fact that none was given? A. No, sir; none at all. Q. Were there any instructions given as to your staying there? A. I have already told you that I had none to receive. Q. Then none were given to you? A. No, sir. * * * Q. Had the Houssiere-Latreille Oil Company taken physical possession of the property? A. They had possession of the mineral right only. Q. How did they take possession of those mineral rights? A. By the sale passed between us. Q. Is that the only way in which they took possession? A. No, not the only way. Q. What is the other? A. Because the other members of the society had one-fifth of the property. Q. Had the I-Ioussiere-Latreille taken possession of those mineral rights to bore? A. They had taken possession, first, because, by the contract passed between the company and the Rayne Planters Oil & Development Company. Q. Is that the only way in which they took possession — by the contract passed between the company and the Rayne Planters Oil & Development Company? A. No, sir. Q. What else? A. I have already stated from the sale I made to the company. Q. Well, what I want to know is this: if you say the Houssiere-Latreille Oil Company acquired the mineral rights from the sale made by you to them, whether they did anything to take physical possession of those rights? A. No, sir; not until then. Q. Until when? A. Until they passed the contract between the company and the Rayne Company. Q. Now, Mr. Latreille, you speak of the contract of the company with the company of Rayne. Now, is it not a fact that the Rayne Company did not take any physical possession whatever of the property until, as you have already stated, quite a few days after the Jennings-I-Ieywood Oil Syndicate had commenced to put its derrick there — at least fifteen days? A. They commenced fifteen days after, when that party from Rayne came to put up the derrick, the Jennings-Heywood . Syndicate had put theirs down where they had chosen.”
At another time the witness testified that he gave to Lazard, the secretary of the plaintiff company, possession of the surface by showing him the lines of the land, though he is unable to remember when that was done. And in answer to the question propounded by plaintiff’s counsel, “At the time that the contract [referring to the. contract with defendant] was entered into, in April, 1901, how many oil wells were in existence in that neighborhood?” he answers, “There were none at all.” He further states that there *75 were at the time that he testified, some three years later, about 70 such wells in the neighborhood. Eugene Houssiere, a brother-in-law of Latreille, and a member of the plaintiff corporation, being asked, “Is the I-Ioussiere-Latreille Company in possession of the 40-acre tract in controversy, or who is in possession of it?” answers, “We have always had possession of it; nobody else has taken possession of it.” Using the pronoun “we” in another connection, he was asked whom he meant, and he replied, “I say ‘we,’ meaning me and my brother-in-law.” And being asked, “Are you expected by the Houssiere-Latreille Oil Company to look after this property and keep trespassers off of it?” he answers, “Yes, sir; we have been expected to do that ever since we formed the corporation.” There is nothing in the record to show that this witness, or any one else, save Latreille and his family, had ever occupied the surface of the land prior to the entry by defendant.
Opinion.
This was, no doubt, begun as a possessory action, and, the defendant having denied the alleged possession and the disturbance thereof, the issues might have been confined to the hare question of possession vel non and disturbance vel non. Code Prac. arts. 53, 55. But the defendant specifically set up and made part of its answer the contract therein referred to, averred it to be a lawful contract, which had been faithfully complied with, and prayed not that the court should confine itself to deciding as a fact whether the plaintiff had been in possession for a year, or whether in fact or in law the defendant had disturbed that possession, hut that it should decide that the defendant was and is “lawfully entitled to the possession of said land for the purposes stated in the aforesaid contract of April 19, 1901, hereunto annexed.” The plaintiff made no objection to this defense or to the evidence, including the contract, offered in support of it; and, as the contract was pleaded and offered for all that it was worth, it might, perhaps, he inferred that the parties had waived, as they had the right to waive, the objection that the issues so presented do not properly arise in a possessory action. The defendant’s counsel, however, now insist that the court shall go no further than to inquire whether or not the contract thus relied on is, upon its face, an absolute nullity; and the counsel for the plaintiff say in one of their briefs:
“It was our view that the title set up by the defendant was of that variety [an absolute nullity], and, unless it is, we would not ask the court to introduce confusion into the practice by devoting thp possessory action to extracodal uses, so as to adjudicate its effect.”
We are of opinion that in an action of this character a defendant has no right to set up title, whether by lease or conveyance, whether emanating from the plaintiff or the plain- • tiff’s author or other persons, or whether for the purposes of an inquiry as to its absolute or its relative nullity. The law reads:
“The plaintiff in a possessory action needs only, in order to make out his ease, to prove that he was in possession, * * * and that he has been either disturbed or evicted within the year previous to the suit. So that, when the possession of the plaintiff, or the act of disturbing him is denied, no testimony shall be admitted except as to the fact of the possession, or as to the act of disturbance, and all testimony relative to property shall be rejected.” Oiv. Prac. art. 53.
“Petitory and possessory actions shall not be cumulated and joined together except by consent of parties. Therefore, he, who is sued in a possessory action, cannot bring a petitory action until after judgment shall have been rendered in the possessory action, and until, if he has been condemned, he shall have satisfied the judgment given, against him.” Code Prac. art. 55.
It is evident that if the owner who is made defendant in a possessory action brought by a mere usurper cannot set up his title by way of defense, the lessee, who has allowed some one else to occupy the property leased by him for a year, is in no better position. The law-makes no distinction as to the person or the character of the title, and we can make none. *76 The cases of Boniel v. Block, 44 La. Ann. 514, 10 South. 869, Beland et al. v. Gebelin, 46 La. Ann. 326, 14 South. 843, and Waller v. Cockfield, 111 La. 595, 35 South. 778, contain nothing to the contrary, and any expression contained in the opinion heretofore handed down pointing to another conclusion may be regarded as inadvertence.
It is competent, however, for the parties litigant to consent to the injection into a suit pending between them of almost any issue that may bear upon the ultimate result; and as a possessory action may, by consent, be converted into a petitory action, with the original defendant as plaintiff, so the issue upon the title presented may, by consent, be limited to the question of absolute nullity vel non, and that seems to have been done in this case. We shall therefore confine the present inquiry to those issues to which the Code of Practice confines the possessory action, plus the issue of absolute nullity vel non of the title set up by defendant and injected into the case by consent.
The deed transferring the title to the land in question to the plaintiff was executed in May, 1903, and this suit was brought in December of that year. It was shown by the oral testimony of plaintiff’s author and principal witness, and without objection, that only the mineral rights were conveyed. There is no pretension that plaintiff has ever been in actual possession, either by itself or through others, of the surface rights in said land, and the only evidence of the actual possession for the purposes of its mineral rights consists of the testimony of Latreille and Houssiere, part of which has been quoted, to the effect that Latreille, or some one else, held such possession for the plaintiff. Conceding, argumenti gratia, that one whose mineral rights do not entitle him to enter upon the surface of the land, the title and possession of which is in another, save for the purposes of, or in connection with, operations for the development of minerals, can acquire and hold such rights through another, who does not engage in such operations, it is nevertheless clear that the other person thus actually holding must do so with the understanding on his part that he is holding for the owner or lessee; and in the present instance we fail to find that this is the case, Latreille, upon whom plaintiff relies, testifying as positively as he testifies to anything else that plaintiff’s actual possession began when the Bayne Company appeared and erected its derrick in January, 1904, after the filing of this suit, and 15 days or 3 weeks after the derrick of the defendant had been erected. So that, as Latreille ceased to hold possession of the mineral rights (according to his theory of his relations with the plaintiff), for his own account, when he sold them to plaintiff in May, 1903, there was no one in possession of those rights between that time and the date of the defendant’s entry in the following December, and the plaintiff then lacked the necessary possession upon which to predicate a possessory action. As we have seen, however, by the consent or acquiescence of the parties the court is authorized to proceed further, and decide whether the contract under which the defendant asserts possession of the rights in dispute not only in fact but in law, is, upon its face, valid or invalid.
The contract reads in part as follows, to wit:
“The said party of the first part [Latreille], for and in consideration of the sum of one dollar to him * * * in hand paid by the said party of the second part [S. A. Spencer] * * * and of the covenants and agreements hereinafter mentioned, has leased unto the said party of the second part, its successors and assigns, for the sole- and only purpose of mining and operating for oil, gas, and laying pipe lines, and of building tanks, stations and structures thereon to take care of said product, all that certain tract, * * * reserving, however, therefrom - feet around the building, on which no well shall be drilled by either party except by written consent. It is agreed that this lease shall remain in force for the term of ten years from this date and as long thereafter as oil and gas or either of them, is pro *77 duced thereupon by the party of the second part, its successors and assigns. In consideration of the premises, the said party of the second part covenants and agrees: First: To deliver to the credit of the first party, his heirs and assigns, free of cost, in the pipe line to which it may connect its wells, the equal of % part of all oil produced and saved from the leased premises; and second: To pay % of all gas from each and every well drilled in said premises, the product of which is marketed and used off the premises, said payment to be made in each well within sixty days after commencing to use gas therefrom as aforesaid, and to be paid yearly thereafter while the gas from said well is used. Said party covenants and agrees to locate all wells so as to interfere as little as possible with the cultivated portions of the farm, and, further, to commence operations on said premises within six months from the date hereof or pay, at the rate of $50, quarterly, in advance, for each additional three months such operation is delayed until such well is completed, and it is agreed that the completion of such well shall be and operate as a full liquidation of all rental under this provision during the term of this lease. It is agreed that the second party is to have the privilege to use sufficient water from said premises to run all necessary machinery, and, at any time, to remove all machinery and fixtures placed on said premises, and, further, upon payment of one hundred dollars, a.t any time, by the party of the second part, its successors or assigns, to the party of the first part, his heirs and assigns, said party of the second part, its successors or assigns, shall have the right to surrender this lease for cancellation, after which, all payments and liabilities thereafter to accrue under and by virtue of its terms shall cease and terminate and this lease become absolutely null and void.”
It may at once be predicated of this contract that it was not intended as a “lease of land,” and that it does not confer upon the defendant the rights of a “lessee” in the ordinary acceptation of those terms. It declares that it is made “for the sole and only purpose of mining for oil, gas,” etc., and the parties stipulate that the wells to be drilled in the search for oil and gas are to be so located “as to interfere as little as possible with the cultivated portions of the farm.” It was therefore clearly contemplated that the surface, which is usually the main consideration in a lease of land, should not be included in the contract, save in so far as its use might be necessary in connection with the mining for oil and gas’ and the handling of those products, and the defendant has therefore no right to enter upon the-property, or to make use of it, save in that, connection.
Counsel for plaintiff argue that, whilst the owner has agreed to furnish his land for the purposes and subject to the conditions-of the contract, the defendant has not bound itself to drill for oil, and that, as the declared purpose of the contract is the obtention of oil, there is lack of mutuality of obligation, by reason of which, and because it is unconscionable (meaning, as we understand it, because there is an insufficient consideration moving to the owner), the contract is void. Waiving the question whether these objections can be reconciled with each other, the declared purpose of the contract is one thing, and the agreement as to what shall actually be done for the accomplishment of that purpose is another. The declaration of purpose may be said to furnish the light in which the agreement is to be interpreted; hut the agreement is the contract, and the light is to be used to ascertain, and not to distort, its meaning. It is true that Latreille has agreed to hold the land, but it is not true, as we understand it, that the defendant has not agreed to drill for oil. The stipulation on that subject is that the defendant shall commence operations within six months from the date of the contract, or that for each quarter’s delay thereafter it shall pay at the rate of $50 in advance. This, in one shape or another, is a very common stipulation, and, whether the sum agreed to he paid in the event of delay in the discharge of the initiatory or any other obligation of a contract be called penalty, demurrage, liquidated damages, rental, or what not, the result is very much the same. The stipulation for mere delay in its execution cannot operate to discharge the obligation, and under the particular contract and stipulation that we are now considering, as the right of the defendant to enter upon the land, and hence its ability to drill for oil. ceases at the expira *78 tion of 10 years (unless oil be found before that time), it would be obliged to complete a well witbin that period, or render itself liable in an action for damages. This stipulation therefore contains no potestative condition, nor is it obnoxious to the objection of want of mutuality of obligation. Whether it is unconscionable because the consideration moving to the owner of the land is insufficient in itself, or in view of the possible duration of the delay, is another question.
It is said, however, that the obligations to drill for oil or pay rental in case of delay, and to drill, when the right of delay expires, within the term of the contract, are alike dependent for their discharge upon the will of the defendant, in that the defendant may, at its option, and at any time, cancel the entire contract; and that this, at least, is a potestative condition by reason of which the contract was void ab initio. The trouble, as in the ease first considered, lies in the premises. One is not said to do at will that which he can do only upon giving an equivalent for the privilege of doing. In this instance the defendant can cancel the contract only upon paying §100, and, if such a condition could be called potestative, it falls within the rule of Oiv. Code, art. 2035, which provides that the potestative conditions which nullify obligations are those “which make the obligation depend solely on the exercise of the obligor’s will; but if the condition be that the obligor shall do or not do a certain act, although the doing or not doing of the act depend on the will of the obligor, yet the obligation depending on such a condition is not void.” Let us suppose, however, that this condition were not in the contract, and that our conclusions as to the obligations of the defendant are otherwise correct; and let us further suppose that it had become more doubtful than it was originally whether drilling wells in the parish of Acadia would produce anything but dust. The defendant would then' find itself burdened with a 10-years lease, under which it would be obliged to drill or pay rent, and eventually, perhaps, face a suit for damages. Will it be said that under such circumstances it could not lawfully agree with the owner of the land to pay a lump sum in discharge of its obligations? And if an agreement of that kind would be lawful, why is it not lawful to provide in advance for the contingency out of which it might arise? The latter is the course that has been pursued in this case. The parties agreed in advance that upon the payment of a certain sum, presumably regarded as an equivalent therefor, the defendant might at any time exercise the privilege of annulling the contract into which it was then entering. Whether the amount agreed on was too small* or too great is another question, which may be briefly considered, although it is hardly within the scope of the present inquiry.
Latreille would no doubt have been glad to have had oil discovered upon his land .at once, but the field was wholly unproved; in fact, so far as we are informed, oil had not up to that time been successfully mined in this state, and he was unable or unwilling to risk the capital necessary to drill a well in search of it. No doubt, if he had been able to find a person willing to take that risk without delay, and without condition, and give him the benefit of the result, he would have done so; but it is fair to assume that he was unable to find such a person. No doubt, too, if he had known that oil would be found, and had succeeded in convincing others of that fact, the path to a more satisfactory arrangement for its extraction would have been opened to him. But as matters stood, without prophetic knowledge, apparently without capital, having 40 acres of land, which (it has been said, in argument) were then worth, say §Í0 an acre, he did that which, in his judgment, was best; i. e., he made the contract now under consideration, which was to prove sat-.. *79 isfactory to him, but unsatisfactory to the defendant, if oil should not be discovered, and unsatisfactory to him, but satisfactory to the defendant, if oil should be discovered. In the former case he would have witnessed find profited by the misfortune of his friend, the present enemy, in being compelled to expend $10,000 (more or less) uselessly, or, in being compelled to pay him $50 a quarter for land of which he was retaining the use, or in being compelled to pay him $100 in order to get out of the trouble. In the latter case (which is the ease here presented) he would have found (as he seems to have found) occasion to regret that he had not made a more advantageous bargain. If the possibilities of success and of failure in the search for oil presented themselves to his mind, it may be assumed that they also presented themselves to the intelligence of the defendant. If he had no money that he was able to lose in that search, it may be assumed that the defendant had none that it was willing to Ipse. Latreille was not posing as a philanthropist, nor was the defendafit. They met upon common ground for the purposes of a business enterprise, from which each hoped to derive a profit, but the results of which were involved in doubt; and they entered into a contract, commutative throughout, under which Latreille, no matter how disastrous the enterprise might prove, was bound to receive at least $100, and might actually part with nothing, whilst the defendant was bound for the payment of at least $100, and might receive nothing. Under these circumstances we are not prepared to say that the consideration agreed on, whether for the privilege of delaying its execution or of canceling it, is insufficient to sustain the contract, and upon the face of the papers we find no more reason why Latreille or the plaintiff should complain of the ethics of the transaction than of the legality.
In the light of subsequent events, it may bé said that the contract was ill advised on the part of Latreille; but it has not been suggested that he was unable to obtain, or that he did not obtain, better advice than he acted on; nor has it been suggested that with the best advice he could at that time have made a better contract. Whether the contract, as made, has been complied with, is not a question affecting its original validity, and is not here considered. In conclusion it may be remarked that the right reserved to the defendant to remove its machinery appears to us to be merely an incidental matter, relating, perhaps, to the security of the one party to the contract and to the convenience of the other, but which does not otherwise affect the contract itself.
For the reasons thus assigned, it is ordered, adjudged, and decreed that the judgment heretofore rendered be now reinstated and made the final judgment of the court.